Rosezella COOK et al.

v.

OCHSNER FOUNDATION HOSPI-
TAL et al.

Civ. A. No. 70–1969.

United States District Court,
E. D. Louisiana.

Oct. 16, 1972.

See also, D.C., 319 F.Supp. 603.

Jeffrey B. Schwartz, Marilyn G. Rose, Washington, D. C., for plaintiffs.

John J. D'Angelo, Gretna, La., Walter M. Barnett, Leonard B. Levy, Neville M. Landry, Charles E. McHale, Jr., Peter C. Rizzo, co-counsel, Charles Kohlmeyer, Jr., C. E. Henican, Henican, James & Cleveland, New Orleans, La., Peter E. Duffy, Nick J. Gagliano, Metairie, La., Walter J. Horrell, State Dept. of Hospitals, Baton Rouge, La., George M. Strickler, Jr., Benjamin F. Hatfield, New Orleans, La., Peter Brickfield, Dept. of Justice, Washington, D. C., Thomas A. Rayer, New Orleans, La., Monroe & Lemann, Ben R. Slater, Jr., Walter Suthon, II, Stephen B. Lemann, New Orleans, La., for defendants.

## MEMORANDUM OF REASONS

COMISKEY, District Judge.

### PARTIES

The plaintiffs in this case are a class of poor people in New Orleans whose incomes are below the recognized poverty level. Welfare, food stamps, Social Security, Medicaid, and a little "charity" seem to constitute their income.

The plaintiffs sued hospitals in the Greater New Orleans area including Ochsner Foundation Hospital, Flint-Goodridge Hospital, Hotel Dieu Sisters Hospital, Methodist Hospital, Sara Mayo Hospital, West Jefferson General Hospital, East Jefferson Hospital, and Charity Hospital. They also sued Touro Infirmary, another New Orleans hospital, but after some discovery, and adjustments by Touro, their suit was dismissed as to Touro. They also sued the U. S. Secretary of Health, Education, and Welfare and the Louisiana Director of State Department of Hospitals. Later, the plaintiffs joined members of the Federal Hospital Council in their capacity as members of the Council. The Council figures prominently into HEW rule making to enforce Hill-Burton obligations on the defendant hospitals.

### CAUSES OF ACTION

Two of the several causes of action presented in this case involve the construction of a federal statute.

42 U.S.C. § 291c(e)

The Surgeon General, with the approval of the Federal Hospital Council and the Secretary of Health, Education, and Welfare, shall by general regulations prescribe—

(e) that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, *assurance shall be received by the State from the applicant that* (1) *the facility or portion thereof to be constructed or modernized will be made available to all persons* residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized *a reasonable volume of services to persons unable to pay therefor,* but an exception shall be made if such a requirement is not feasible from a financial viewpoint. (Emphasis added)

In compliance with this statute all of applicant hospitals have given their assurances that the hospital will be available for use by the general public and a reasonable volume of services will be made available to persons unable to pay. The availability of the hospital for use by the general public referred to in (1) above is generally referred to as obligation to provide a 'community service'. The obligation of the hospital to provide

a reasonable volume of services to persons unable to pay referred to in (2)

**I. Interim order dated August 1, 1973**

This suit was brought by eight named individuals as a class action seeking to compel enforcement of the provisions of the Hill-Burton Act (42 U.S.C. § 291 et seq.), its implementing regulation, and assurances received thereunder that a reasonable volume of services be made available to persons unable to pay therefor. The complaint, which alleged violations of said requirements by ten hospitals which ha received grants under said program and by the State agency charged with responsibilities under the program within the State of Louisiana, was subsequently amended in May 1971 to include allegations of violations of his obligations by the U. S. Secretary of Health, Education, and Welfare.

By its Order of November 28, 1970, Cook et al v. Ochsner Foundation Hospital et al, 319 F.Supp. 603 (E.D.La.1970) this Court determined that plaintiffs have standing to assert claims under said Statute, that there was a cause of action, and that individual plaintiffs represented a class pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure. By its Order of March 21, 1972, other allegations involving constitutional and civil rights causes of action were severed and the Hill-Burton causes were set down for trial on the merits for July 10, 1972. Subsequently, defendants Mercy Hospital and its administrator, Sister Dorothy Calhoun, withdrew the application for Hill-Burton funds and were dismissed from the Hill-Burton causes of action.

On July 6, 1972 certain of the defendant hospitals filed a motion to dismiss, predicated upon the decision of the U. S. District Court for the District of Columbia in Perry et al v. Greater Southeast Washington Hospital Foundation, et al Civil Action No. 725–71, June 28, 1972. On July 10, 1972 this Court denied said motion.

On July 10, 1972 plaintiffs and defendants Touro Infirmary and its administrator, Dr. Murray Diamond, filed a stipulation and settlement of all issues and causes of action with respect to said defendants.

Pursuant to the Motion filed herewith, the undersigned parties appearing herein through their counsel of record, do hereby consent to the entry of the following interim Order in lieu of a trial and judgment of the Hill-Burton issues scheduled for trial commencing July 10, 1972.

### ORDER

**IT IS ORDERED THAT**

1. The defendant hospitals and their respective administrators shall provide free above was resolved when the parties reached a compromise of this issue.[1]

and below cost services to persons unable to pay therefor in the amounts set forth below on an annual basis:

| Hospital | Amount |
| --- | --- |
| Ochsner Foundation Hospital | $223,000 |
| Flint Goodridge Hospital | 34,000 |
| Hotel Dieu Sisters Hospital | 114,000 |
| Methodist Hospital | 130,000 |
| Sara Mayo Hospital | 85,000 [1] |
| West Jefferson General Hospital | 167,000 |
| East Jefferson Hospital | 230,000 [1] |
| Touro Infirmary | [2] |

Said defendants are ordered to submit to the Court a program for implementation and provision of said services.

2. The defendant hospitals and their administrators shall develop programs to increase their respective participation in the Medicaid program and the amount of services available to Medicaid beneficiaries in the respective hospitals, and any losses in accepting Medicaid beneficiaries will be included as part of its contribution under paragraph 1. However, plaintiffs reserve the rights to challenge the losses and contend that, properly administered, there should be no losses under the Medicaid program.

3. The programs described in paragraphs 1 and 2 above shall be submitted to the Court and to all the parties by September 1, 1972, and shall become effective immediately except for good cause. However, the program as to Hotel Dieu need not commence until 60 days following the commencement of patient care and admissions in their new hospital facility.

4. In connection with the provision of free and below cost services said hospitals shall make prior determinations of eligibility for services, when feasible.

5. In the operation of the programs established under paragraphs 1 and 2 above, West Jefferson General Hospital and East Jefferson Hospital may give first preference to residents of their respective geographic areas.

6. Reports of the results of the programs set forth in paragraphs 1 and 2 above shall be submitted to the Court and to all the parties within six months from the commencement of said programs, except the results of the programs concerning participation in the Medicaid program shall also be submitted within three months from the commencement of the programs.

7. For a twelve month period or until the anticipated HEW guideline is finalized,

Another cause of action in this case is a charge of racial discriminatory practices by the defendant hospitals. However, by stipulation the trial of this issue has been severed from the trial of the first two causes of action.

In its present posture, then, the cause of action before the Court now is a suit for injunctive and declaratory relief seeking to compel the defendant Secretary of Health, Education, and Welfare to enforce the provisions of law contained in the Hill-Burton Act, namely,

42 U.S.C. § 291c(e), and the present implementing regulations relating thereto, namely, 42 CFR 53.112(a)(1) and 42 CFR 53.1(s) in so far as this law and regulation require the defendant hospitals to provide a "community service".

The pertinent law and regulations which are before the Court in this 'community service' cause of action read as follows:

"The Surgeon General[2], with the approval of the Federal Hospital Council and the Secretary of Health, Educa-

whichever is shorter, the State agency shall be a fact gathering instrumentality. The State agency shall oversee this interim settlement, and it shall report to the Court upon the Court's request. The defendant hospitals shall cooperate with the State Department of Hospitals and shall provide appropriate information to the State agency for the purpose of executing its responsibility.

8. Elliot Richardson, as Secretary of Health, Education, and Welfare, is not a party to this interim consent order. Appropriate motions for summary judgment shall be filed by September 1, 1972, by plaintiffs and by said Federal Defendant with respect to his obligations under the Hill-Burton Act as more fully set forth in Appendix 6M in the pre-trial order.

9. The parties shall have the right to appeal to the Court for relief from the effect of this Order because of special circumstances, and further the Court upon notice and hearing shall decide any disputes arising under the terms of this Order.

10. This Order shall expire at the end of twelve months from the operative date of the programs established under paragraphs 1 and 2 above. However, if within the twelve months period the U. S. Department of Health, Education, and Welfare promulgates and causes to be published in the Federal Register a final regulations, the standards set forth in said regulation shall supercede and supplant the standards set forth in this Interim Order; or alternatively, if the interim Regulations published in the Federal Register on July 22, 1972 (37 Fed. Reg. 14719) becomes operative on November 4, 1972 because no superceding final regulation has been issued, then said interim regulations shall supercede and supplant the standards set forth in this Interim Order, in either event such standards shall be retroactive to September 1, 1972, for the purpose of this Order.

11. Charity Hospital shall cooperate with all reasonable requests by the other hospitals for assistance in development of their Medicaid and free and reduced cost care programs.

12. This Order, when approved pursuant to the Order of July 14, 1972, is entered pursuant to the consent of the parties hereto solely to provide an interim program satisfactory to the parties in lieu of a trial and judgment with regard to the Hill-Burton issue, and the execution by the parties of their consent to this Interim Order and the Entry of this Order shall not in anyway constitute a waiver by any party hereto of any claim, defense, or other legal right, including but not limited to all rights with respect to the claims asserted by plaintiffs in their complaint and the defenses set forth by the defendants in their answers and motions to dismiss denied by this Court by its Orders of November 28, 1970, and July 10, 1972, and to all rights to challenge the legality and constitutionality of the regulation when promulgated.

1. However, Sara Mayo and East Jefferson shall provide such service for six months with the matter to be reopened as to the amount of such service at the end of the six month period.

2. Touro Infirmary was dismissed from this action by consent upon the Court being advised that Touro was providing $845,000 in free and below cost to persons unable to pay therefor.

2. Abolition of Office of Surgeon General
The Office of the Surgeon General was abolished by section 3 of 1966 Reorg. Plan No. 3 eff. June 25, 1966, 31 F.R. 8855, 80 Stat. 1610, and all functions thereof were transferred to the Secretary of Health, Education, and Welfare by section 1 of 1966 Reorg. Plan No. 3 set out as a note under section 202 of this title.

tion, and Welfare, *shall* by general regulations prescribe—

\* \* \* \* \* \*

(e) that the State plan *shall provide* for adequate hospitals, . . . for all persons residing in the State, and adequate hospitals . . . to furnish needed services for persons unable to pay therefor.

Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, *assurance shall be* received by the State from the applicant that (1) the facility . . . *will be made available* to all persons residing in the territorial area of the applicant; (Emphasis added)

42 U.S.C. § 291c(e)

\* \* \* \* \* \*

42 CFR 53.112

§ 53.112

Community service; no discrimination.

(a) Before an application under this part is recommended by a State agency to the Secretary for approval, the State agency shall obtain assurances from the applicant that:

(1) The facility will furnish a community service; and

(2) [This sub-section prohibits discrimination based on 'creed', 'race', 'color', 'national origin'].[3]

42 CFR 53.1(5)

§ 53.1(5)

"Community Services", when applied to any facility, means that (1) the services furnished are available to the general public, or (2) admission is limited only on the basis of age, medical indigency, or type or kind of medical or mental disability or (3) the facility constitutes a medical or nursing care unit of a home or other institution which home or institution is available in accordance with subparagraph (1) or (2) of this paragraph."

\* \* \* \* \* \*

## CONTENTIONS OF THE PARTIES

The plaintiffs seek enforcement, then, of the Hill-Burton Act, *supra,* and the HEW regulations, which require defendant Hill-Burton subsidized hospitals to provide a 'community service'. The charge of non-enforcement of the 'community service' obligation grows out of the uncontroverted fact that the defendant hospitals excluding Charity Hospital of Louisiana at New Orleans, either have refused to accept Medicaid patients (42 U.S.C. § 1396 et seq.) or have accepted Medicaid patients so sparingly that such minimal acceptance constitutes in effect a refusal to accept Medicaid patients. The plaintiffs further charge

---

3. (2) All portions and services of the entire facility for the construction or modernization of which or in connection with which aid, under the Act is sought will be made available without discrimination on account of creed, and no professionally qualified person will be discriminated against on account of creed with respect to the privilege of professional practice in the facility.

(b) Each construction contract is subject to the condition that the applicant shall comply with the requirements of Executive Order 11246, September 24, 1965 (30 F.R. 12319), relating to non-discrimination in construction contract employment, and the applicable rules, regulations, and procedures prescribed pursuant thereto.

(c) Attention is called to the requirement of title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d; 78 Stat. 252) which provides that no person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial assistance. A regulation implementing such title VI, applicable to assistance under this part for construction and modernization of hospitals and medical facilities, has been issued by the Secretary of Health, Education and Welfare, with the approval of the President (45 CFR Part. 80).

a violation of the 'community service' obligation because the defendant hospitals (excluding Charity) require a patient to have a private physician before admission. Such a requirement plaintiffs allege, effectively excludes them and their class from admission to these private—but Hill-Burton subsidized—hospitals. They contend they are without private physicians due to certain socio-economic factors such as poverty and race. They ask then, to strike down the hospital devised policy of no admission unless your private physician requests admission. This hospital policy violates the 'community service' law, the plaintiffs contend.

■ The defendant federally subsidized hospitals contend that their policy of no admission without your private physician is a reasonable and necessary admit procedure. That this admit policy does not have as its purpose the exclusion of any citizen from these hospitals. Furthermore, this admit policy in practice does not in fact exclude any citizen from admission. To resolve this contention the Court would have to find facts, weigh evidence, and draw inferences from facts found. This is not a permissible procedure in ruling on motions for summary judgment. Fed.R.Civ.P. 56, 28 U.S.C., DeBardeleben v. Cummings, 453 F.2d 320 (5th Cir. 1972). This Court cannot decide in a motion for summary judgment the issue of whether the defendant hospitals' policy requiring a private physician to gain admission is or is not a violation of the 'community service' provision. Therefore, this portion of the relief sought in the motion for summary judgment is denied. This issue must be resolved on the merits after a full evidentiary hearing, unless all relevant facts pertaining to this issue can be stipulated by the parties. However, this record is not in this shape now.

■ That leaves one remaining issue under consideration in the cross motions for summary judgment, namely, the issue of whether the defendant hospitals can refuse Medicaid patients and not thereby violate the law which imposes upon them the duty to provide a 'community service'. The motion for summary judgment by the plaintiffs against the defendant Secretary of Health, Education and Welfare is supported by a statement of material facts not in dispute. The federal defendant's opposition to plaintiffs' motion does not contest any of these material facts, but rather defends on purely legal grounds which will be discussed hereafter. Accordingly, the statement of material facts not in dispute offered by the plaintiffs in support of their motion might be considered as a stipulation of facts by all parties in considering the motions.[4]

In opposition to this remaining issue, the defendant Secretary of Health, Education, and Welfare raises several defenses. First, the defendant Secretary of Health, Education and Welfare contends that this Court is without jurisdiction. The plaintiffs seek to compel the defendant Secretary to enforce the law which the defendant Secretary of Health, Education, and Welfare says is a discretionary function. The pertinent part of the law being relied upon here by the defendant Secretary of Health, Education, and Welfare is 42 U.S.C. § 291c(e) which reads as follows:

"The Surgeon General [now Secretary of Health, Education, and Welfare *supra*] . . . shall by general regulations prescribe—

(e) that the State plan shall provide for adequate hospitals . . . Such regulations *may* also require that . . . . assurance shall be received by the State from the applicant that (1) the facility . . . will be made available to all persons residing in the territorial area . . . " (Emphasis added)

---

4. See copy of Statement of Material Facts attached hereto.

While the Secretary of Health, Education, and Welfare has some discretion in deciding to adopt or not to adopt regulations which would extract assurances from the defendant hospitals to provide a "community service", the fact of the matter is that clear regulations to require a "community service" have been adopted by the Department of Health, Education and Welfare. Section 53.112 from Title 42 of the Code of Federal Regulations, *supra*, shows that the Department of Health, Education, and Welfare has exercised its discretion in favor of requiring applicants for Hill-Burton funds, like the defendant hospitals, to provide a "community service".

"(a) Before an application under this part is recommended by a State agency to the Secretary for approval, the State agency shall obtain assurances from the applicant that:

(a) The facility will furnish a community service;"

Also, all the hospitals admit their contractual assurance to provide a "community service" as required by law and the regulations.[5] Accordingly, the "community service" must be provided by the defendant hospitals and the Department of Health, Education, and Welfare owes the plaintiffs the obligation to require this as a matter of federal statute and the cited regulations.

Secondly, the defendant Secretary defends on the grounds that the present "community service" regulations "are limited in scope to discriminatory admission practices resulting in an absolute exclusion of certain segments of the public."[6] This defense, in effect, favors the very plaintiffs and their class. More than 100,000 citizens of this territorial area are beneficiaries of Medicaid,[7] a federal hospitalization insurance program. And these 100,000 Medicaid-insured citizens are excluded (with a few minor exceptions) from admission to these federally subsidized hospitals. This clearly discriminates against a very substantial segment of the public. This is a clear violation of the "community service" obligation. The Department of Health, Education, and Welfare, under the law and its own regulations, must prohibit this. This reasoning does not conflict with the comments of Senator Hill who sponsored the very legislation when he said:

"We had sought to avoid having the Federal Government attempt in any way to operate the hospitals of the country. We had simply sought to give the states and their subdivisions and to private nonprofit hospitals in the states, aid for the construction and operation of hospitals. The question as to who shall be licensed within a State and who shall practice in a hospital within a State, your subcommittee felt were for the States to determine, not for officials of an agency in Washington." "Congressional Record, Vol. 91 Part 9 pp. 11980. December 11, 1945."

Here the plaintiffs do not seek to license practitioners or to force a hospital to allow a medical practitioner on its staff. The plaintiffs merely seek the right to pay their hospital bill with Medicaid insurance money instead of some private insurance company's money. To admit Medicaid insured patients as other privately insured patients are admitted is to treat all citizens alike— whether they are rich or poor, black or white. Not to follow this policy is discrimination prohibited by the law and the regulations cited.

5. See Stipulation by all hospitals except Hotel Dieu. Hotel Dieu in application for Hill-Burton Funds committed itself to provide a "community service". P. 2 paragraph P.

6. Brief of Federal Defendants in support of their motion for Summary Judgment p. 19.

7. La. Public Welfare Statutes, State of La., Dept. of Public Welfare Table 9, (1971).

RELIEF

■■ The defendant Secretary, who is the Federal government official responsible for implementing the Hill-Burton program, has failed to insure that Hill-Burton hospitals meet their obligations to treat all persons in the territorial area in providing a community service. The defendant Secretary has not issued any rulings, regulations, standards, or taken any specific action with respect to these hospitals, nor to this Court's knowledge, as to any other hospital, to see to it that they terminate their practices and/or policies of excluding substantially all Medicaid beneficiaries. The failure of the Secretary of Health, Education, and Welfare to "prescribe regulations" which would prohibit such discriminatory admit practices by the defendant hospitals is in disregard of the provisions and intent of the Hill-Burton Act. The Federal Courts may enjoin such administrative action or inaction when it is violative of legislative enactments. Sloan v. U. S. Department of Agriculture, 335 F.Supp. 816 (W.D. Wash.1971), Rockbridge v. Lincoln, 449 F.2d 567 (9th Cir. 1971), Shannon v. U. S. Department of Housing and Urban Development, 436 F.2d 809 (3rd Cir. 1970). See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and Abbot Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

This Court therefore concludes that: a. This is an appropriate class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, the class being all persons who are eligible for coverage under the Medicaid Program in metropolitan New Orleans. b. The Secretary of Health, Education, and Welfare has violated his legal obligations to enforce the Hill-Burton Act, its regulations, and assurances received thereunder from Hill-Burton Grantees that they would provide a "community service" by being available to all persons in the territorial area of such facilities, and c. The exclusion of persons covered by the Medicaid Program (Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.) constitutes a denial of service to persons in the territorial area, and consequently a violation of the "community service" obligation of the defendant hospitals.

Accordingly, the plaintiffs' motion for summary judgment is granted and the defendant's motion for summary judgment is denied to the extent set out hereinabove, and more particularly as set out in the attached Judgment.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. The Hill-Burton program is administered by the Health Care Facilities Service, which is a component of the Health Services and Mental Health Administration, Department of Health, Education, and Welfare. Pre-Trial Order, Appendix 6M, subparagraph (c)(1).

2. The Health Care Facilities Service and its predecessors in administering the program since 1947 have never assigned any personnel and/or operated an operational unit with the responsibility to investigate and enforce the assurances of grantees to provide a community service. Pre-Trial Order, Appendix 6M, subparagraph (c)(5).

3. The Health Care Facilities Service has not issued a ruling or taken any action with respect to the issue whether participation in the Medicaid program (42 U.S.C. § 1396 et seq.) is required as part of the community service obligation. Pre-Trial Order, Appendix 6M, subparagraphs (c)(1) and (c)(2)(b).

4. The Health Care Facilities Service has not issued a ruling or taken any action with respect to the issue whether persons without private physicians because of socio-economic factors such as poverty and race must be afforded access into Hill-Burton hospitals either under the "reasonable volume" regulation or the "community service" regulation.

5. There is no administrative mechanism within the U.S. Department of Health, Education, and Welfare, or any constituent part of that Department, including the Health Care Facilities Service, by which the general public or individual persons who are beneficiaries of the Hill-Burton program may generate rulings, regulations, or any action in these regards.

6. With respect to the "community service" obligation the Health Care Facilities Service has promulgated official regulations as set forth in 42 C.F.R. 53.-112 and 53.1(s). Pre-Trial Order, Appendix 6M, subparagraph (c)(2)(b).

7. These regulations currently provide:

". . . the State agency shall obtain assurances from the applicant that: (1) the facility will furnish a community service . . ." 42 C.F.R. 53.112

"A facility provides a community service when (1) the services furnished are available to the general public, or (2) admission is limited only on the basis of age, medical indi-

gency, or type of medical or mental disability . . ." 42 C.F.R. 53.-1(s)

8. These regulations were promulgated in accordance with and under the authority of the following statutory provision:

". . . the Secretary of Health, Education, and Welfare, shall by general regulations prescribe . . . (e) that the State plan shall provide for adequate hospitals, and other facilities . . . for all persons residing in the State . . . Such regulations may also require that before approval of an application for a project is recommended by a State agency . . . for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant . . ." 42 U.S.C. § 291c(e).

9. The Defendant Hospitals received grants under these statutory and regulatory provisions as follows:

| Hospital | Grant No. | Amount | Purpose of Construction |
|---|---|---|---|
| Ochsner | LA–710A | $250,000. | Diagnostic & Treatment Center |
| Sara Mayo | LA–141 | $1,150,000. | General Hospital |
| West Jefferson | LA–709A | $215,000. | Diagnostic & Treatment Center |
| East Jefferson | LA–136 | $3,284,000. | General Hospital |
| Methodist | LA–131 | $1,600,000. | General Hospital |
| Hotel Dieu | LA–140 | $2,288,001.95 | General Hospital |

10. The application form which said Defendant Hospitals signed for the grants described in paragraph 9, required that they would "provide a community service," and all so agreed.

11. The regulation in effect from 1947 through 1964 provided:

General. The State plan shall provide for adequate hospital facilities for the

people residing in a State without discrimination on account of race, creed, or color . . .

Non-discrimination. Before a construction application is recommended by a State Agency for approval, the State Agency shall obtain assurance from the applicant that the facilities to be built with aid under the act will be made available without discrimina-

tion on account of race, creed, or color to all persons residing in the area to be served by that hospital . . . [Thereafter followed the separate but equal clause] §§ 53.61 and 53.62, 12 Fed.Reg. 6874, Code of Fed.Reg. (1947 Supplement)

12. These regulations were promulgated with and under the authority of the following statutory provisions:

Within six months after the enactment of this title, the Surgeon General, with the approval of the Federal Hospital Council and the Administrator, shall by general regulation prescribe . . . (f) that the State plan shall provide for adequate hospital facilities for the people residing in a State, without discrimination on account of race, creed, or color, . . . Such regulation may require that before approval of any application for a hospital or addition to a hospital is recommended by a State agency, assurance shall be received by the State from the applicant that (1) such hospital or addition to a hospital will be made available to all persons residing in the territorial area of the applicant, without discrimination on account of race, creed, or color . . . [Therein followed the separate but equal clause] Section 622, Title VI of the Public Health Service Act, P.Law 725–79, U.S.Code Congressional Service, 79th Cong., 2nd Sess., pp. 1008–9 (1946).

13. The Defendant Hospitals received grants under these prior statutory and regulatory provisions as follows:

| Hospital | Grant No. | Amount | Purpose of Construction |
| --- | --- | --- | --- |
| Ochsner | LA–32 | $1,325,000 | General Hospital |
| Ochsner | LA–109 | $622,407 | Hospital & Research Bldg. |
| | & | | |
| | LA–305B | | Addition to General |
| Flint-Goodridge | LA–62 | $680,716.21 | General Hospital |
| Sara Mayo | LA–60 | $553,156.42 | General Hospital |

14. In addition to the regulatory language set forth above the Health Care Facilities Service, and its predecessors, from time to time have ruled on compliance with the "community service" obligation in cases involving individual facilities which were applicants for funds. Representative examples of such individual rulings provide as follows:

(a) In 1963, upon an application by the Group Health Cooperative of Puget Sound (a pre-paid group practice), the Office of General Counsel stated *inter alia* that in order for the applicant to be deemed in compliance with the "community service regulation" it must be opened to the general public and not be limited to its members. Said General Counsel memorandum also advised the administrator to evaluate critically whether there were practices or policies of the applicant which resulted in a small percentage of members of the public using the facilities of the applicant;

(b) In 1966, upon an application to the State of New York Hill-Burton Agency the question was raised by the State's Assistant Attorney General whether limiting a facility to the medically indigent would violate the "community service" commitment. The Office of General Counsel referred to the literal language of the regulation permitting such a limitation;

(c) In 1969 upon the application of Kaiser Foundation Hospital similar facts were deduced as with the Group Health application in 1963 (to which reference was made) that the facility was not limited to members.

15. The Health Care Facilities Service and its predecessors in administering the program since 1947 has taken the position that under the law the enforcement of the assurances described herein is the initial responsibility of the State Agency. Pre-Trial Order, Appendix 6M, subparagraph (c)(4).

16. The Department of Hospitals of the State of Louisiana is the designated agency to administer the Hill-Burton program in that State. It has been the position of that Agency, that enforcement procedures rest in the hands of HEW when there is an alleged failure to adhere to any Hill-Burton obligation by any participating hospital. Pre-Trial Order, Appendix 6L, subparagraph (b)(8).

17. The Federal Defendant has not assigned the State Agency any further responsibilities with respect to the "community service" obligation than those existing at the time of the commencement of this litigation.

18. The Federal Defendant has stated that the issues of participation in the Medicaid program and accessibility of care are related to the community service obligation. In the Preface to the Interim Regulation of July 22, 1972, with respect to the "free service" commitment, HEW said,

". . . suggestions relating to accessibility to care, and to participation by facilities in the Medicaid program . . . relate to the community service assurance, and will be considered as a request for the revision of the community service assurance." 37 Fed.Reg. No. 142.

19. Said Federal Defendant, however, has not issued any regulations, rulings, standards or guidelines in this regard, and has taken the position that he need not issue any such regulations, rulings, standards, or guidelines.

20. The population of Orleans and Jefferson Parishes is 931,039 persons according to the 1970 census. General Population Characteristics—Louisiana, U.S. Department of Commerce, Bureau of Census PC(1)–B20, pp. 40–41.

21. Throughout 1971, and to date, over 100,000 persons in Orleans and Jefferson Parishes are beneficiaries of the Medicaid program. Louisiana Public Welfare Statistics, State of Louisiana, Department of Public Welfare, Table 9, (1971).

22. Three of Defendant Hospitals have refused to participate in the Medicaid program (Methodist, Sara Mayo, and West Jefferson). The other four Defendant Hospitals have participated only minimally. In 1970 Ochsner collected some $12,289 (Appendix 6B, subpara. (c)(7); Flint-Goodridge collected some $5,016 (Appendix 6C, subpara. (c)(5); Hotel Dieu collected $13,878 (Appendix 6D, para. (c)(5). The only hospital in these two Parishes participating in Medicaid to any significant extent other than Charity Hospital, is Touro Infirmary, which received $112,940 in 1970 and $178,919 in 1971 in Medicaid reimbursements. (Appendix 6G, subpara. 9(b)).

23. Plaintiffs are eight poor women and their children, who, by virtue of their economic status have been beneficiaries of welfare and thus of the Medicaid program since prior to the commencement of this suit.

24. Plaintiffs Cook, Lee and Hunter were told by admitting personnel at Methodist, Ochsner, and Hotel Dieu that the hospitals did not accept welfare or Medicaid patients. (Affidavits attached to Motion for Summary Judgment).

25. Plaintiffs Moore, Hunter, and Brown were told by admitting personnel at Hotel Dieu, West Jefferson and

Flint-Goodridge that the hospitals would not treat them because they did not have private physicians. (Affidavits attached to Motion for Summary Judgment).

26. Charity Hospital of Louisiana at New Orleans is charged to treat persons with incomes below a certain level, which includes persons covered by Medicaid, but because of lack of facilities has been forced to turn away from inpatient hospitalization some 25 to 50 persons a day with conditions which would be admitted at private hospitals.

27(a). Since March 18, 1970 Charity Hospital has kept periodic records of the adult patients seen in the admitting room, tabulated according to:

Number of patients seen;

Number of patients admitted;

Number of patients sent home with conditions that in the opinion of the medical staff ordinarily would have been admitted to a private hospital.

The patients not admitted are referred to the out-patient clinics. They are not admitted as inpatients due to a lack of bed space. According to the records of Charity Hospital, the following is the tabulated disposition of these patients on the dates indicated:

| Date | Total Seen | Total Admitted | Sent home with conditions that should have been admitted at Charity and ordinarily would be admitted at a private hospital |
|---|---|---|---|
| 3–9–70 | 559 | 99 | 62 |
| 4–8–70 | 679 | 111 | 66 |
| 5–4–70 | 620 | 107 | 44 |
| 6–3–70 | 544 | 66 | 33 |
| 7–6–70 | 744 | 96 | 47 |
| 8–5–70 | 690 | 94 | 56 |
| 9–14–70 | 660 | 91 | 65 |
| 10–5–70 | 713 | 114 | 49 |
| 11–9–70 | 625 | 83 | 37 |

27(b) The patients who were not admitted as inpatients but sent home to await out-patient service were in the following specialties:

| Date | Medicine | Surgery | GU | Neuro | Psy | Gyn | Derm | Ortho | OB | ENT |
|---|---|---|---|---|---|---|---|---|---|---|
| 3–9–70 | 26 | 22 | 22 | | | 10 | | | | |
| 4–8–70 | 32 | 24 | 1 | | | 8 | | | 1 | |
| 5–4–70 | 10 | 20 | 4 | | | 9 | 1 | | | |
| 6–3–70 | 18 | 11 | | | | 4 | | | | |
| 7–6–70 | 20 | 19 | 1 | | | 5 | | | 1 | 1 |
| 8–5–70 | 27 | 15 | 1 | 1 | 4 | 7 | 1 | | | |
| 9–17–70 | 25 | 20 | | | 5 | 10 | | 5 | | |
| 10–5–70 | 14 | 8 | 4 | | 1 | 20 | | 1 | | |
| 11–9–70 | 21 | 6 | 4 | | | 6 | | | | |

27(c). Some of the common types of cases which are not given inpatient care who should, in the professional opinion of the Charity staff, be admitted but are referred to ambulatory treatment are:

(i) stroke victims: many persons suffering from strokes are not admitted but are sent home with symptoms such as weakness in an arm. Three weeks later some of these patients will come back with full paralysis on one side.

(ii) impending infarction (impending heart attack);

(iii) ulcers: not actively bleeding but with anemia;

(iv) masses in the lung (which may be cancer or TB):

(v) uncontrolled hypertension with blood pressure over 220/over 140. Such patients are given an injection on a roller bed and watched possibly for 24 hours and then sent home without being admitted into inpatient status. Sending the patient home means that the physicians at Charity do not know whether soon thereafter the patient might go into shock or whether his or her blood pressure shoots back up.

27(d). There are many things lost to a patient who is given ambulatory treatment and then sent home rather than be admitted as an inpatient:

(i) there is a delay in diagnosis, which may be critical;

(ii) his treatment is not being supervised, e. g., the effects of medicine upon his system is not under surveillance for 24 hour periods if he is not an inpatient;

(iii) the patient may have adverse reaction but have a problem getting an ambulance and not come to the hospital;

(iv) poor people may be better off in a hospital because of communication problems concerning effects of treatment.

(Answers to Interrogatories and Supplemental Interrogatories to Charity (Court Docket No. 75, No. 138, No. 225); Pre-Trial Order, Appendix 6K, paragraphs (c)(12), (13), (13a), (13b); Affidavits of Dr. Charles C. Mary, Jr., Dr. Albert Lauro, Dr. Rod Yeager, and Mr. Raymond Downs with attachment, attached to Additional Affidavits in Support of Plaintiffs' Motion For Summary Judgment.

28. There is an additional need for medical facilities in the metropolitan New Orleans area, and that this need has resulted in and will continue to result in inadequate personnel and facilities to serve the health care needs of this community at every socio-economic and cultural level; that this need is more prevalent and concentrated in those socio-economic areas of the community which are financially and economically unable to pay for such services through their own private sources or by adequate hospitalization insurance. Pre-Trial Order, Appendix A, subparagraph 4.

29. The Health Care Facilities Service first learned about this lawsuit in August 1970 but has done nothing to date with ascertaining the accuracy of the factual allegations.

Date: Oct. 16, 1972

Respectfully submitted,
s/ Marilyn G. Rose
Marilyn G. Rose